UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SCOTT E. JONES,

     Plaintiff,                                 Case No. 24-cv-11965

                                              Honorable Nancy G. Edmunds

v.

ST. CLAIR COUNTY, et al

     Defendants.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [32]**

This matter is before the Court on Defendants' motion for summary judgment. (ECF No. 32.) Plaintiff responded (ECF No. 36) and Defendants replied (ECF No. 38). Pursuant to E.D. Mich. L.R. 7.1(f)(2), the Court dispenses with oral argument because it would not significantly aid the decision process.

Plaintiff is a former lieutenant in the St. Clair County Sheriff's Office. He complained to the County's human resources department ("HR") about perceived favoritism or nepotism in the handling of the Sheriff's brother's drunk-driving arrest. Less than a week after the HR complaint, the Sheriff ordered an investigation into a potential "leaker" who provided details about the drunk-driving arrest to someone outside the department. After the Sheriff's subordinates received information implicating Plaintiff in the leaks, Plaintiff voluntarily retired in lieu of facing discipline or further investigation.

Plaintiff now brings claims under 42 U.S.C. § 1983 for First Amendment retaliation and procedural due process violations. Plaintiff's First Amendment retaliation claim is

1

based on three actions taken by Defendants: (1) an alleged "sham" investigation meant to falsely identify Plaintiff as the leaker, (2) a purported constructive discharge that occurred when Plaintiff resigned, and (3) damage to Plaintiff's good name and reputation from investigatory findings made in a report by one of the Sheriff's subordinates. Plaintiff also claims that the constructive discharge and the investigatory findings violated his due process rights.

The constructive discharge theory fails because Plaintiff's resignation was voluntary. Plaintiff's claims arising out of the investigatory findings fail because the findings were never shared with anyone and thus could not have harmed Plaintiff's reputation. But the First Amendment retaliation theory arising out of the alleged "sham" investigation survives because there is a question of fact as to whether the investigation was motivated, at least in part, by a desire to punish Plaintiff for his complaint to HR. Thus, the Court GRANTS summary judgment as to Plaintiff's due process claim, GRANTS summary judgment on the First Amendment claim to the extent that it relies on the purported constructive discharge or investigatory findings that were not made public, and otherwise DENIES summary judgment as to Plaintiff's First Amendment claim. The Court also DENIES qualified immunity as to Plaintiff's surviving constitutional claim because Plaintiff's right to report perceived misconduct outside his chain of command without fear of retaliation was clearly established, DENIES summary judgment on Defendants' defense of accord and satisfaction because the evidence does not clearly show that Plaintiff knowingly relinquished his right to bring this lawsuit in connection with his voluntary retirement agreement, and DENIES summary judgment as to *Monell* liability

because the Sheriff had final authority to establish municipal policy for disciplinary actions within his own department.

## I.    Background

Defendant Mat King ("Sheriff King" or the "Sheriff") is the Sheriff of St. Clair County, Michigan, a position that he has held since 2021. (ECF No. 32-2, PageID.412.) The County Sheriff's office consists of 250 employees, including 87 sworn officers. (*Id.* at PageID.423.) At the time that Plaintiff worked in the Sheriff's office, the office's supervisory personnel included the Sheriff, Undersheriff Jim Spadafore, Captain Matt Pohl, and six lieutenants. (*Id.* at PageID.413; ECF No. 36-2, PageID.1273.)

Plaintiff Scott Jones is a former lieutenant in the Sherriff's office. He began working for the County as a full-time sheriff's deputy beginning in 1997. (ECF No. 36-2, PageID.1268.) Sherriff King promoted Plaintiff to the rank of lieutenant effective February 5, 2021. (*Id.*) In this role, Plaintiff was responsible for overseeing a platoon of 12 officers. (*Id.* at PageID.1273-74.) His job description included various managerial tasks, such as "provid[ing] counseling and guidance to subordinates," "[patrolling] the County to assist deputies and insure [sic] their compliance with assigned duties," and "[i]nspect[ing] the work of command staff and other subordinates." (ECF No. 36-23, PageID.2655.) Per his testimony, Plaintiff's job duties also included carrying out the missions, directives, and policies of the Sheriff; speaking on behalf of the Sheriff at township board meetings; and occasionally appearing at ceremonial events, such as parades and 4H fairs. (ECF No. 36-2, PageID.1274-75.) Plaintiff's work was performed "under the direction of the Sheriff with direct supervision by [the] Captain and [the] Undersheriff." (ECF No. 36-23, PageID.2655.)

3

In the early morning of November 6, 2022, Sheriff King's brother, Deputy Marcus King, was pulled over by an officer of the Port Huron Police Department. (ECF No. 36-5, PageID.1654.) Plaintiff and two of his subordinate deputies arrived at the scene. (*Id.*) A breath test conducted at the scene showed a blood alcohol content ("BAC") of 0.183. (*Id.* at PageID.1655.) Deputy King was arrested for driving while intoxicated on a public roadway. (*Id.* at PageID.1656.) Plaintiff directed one of the deputies to transport Deputy King to the Lapeer County Jail—rather than the jail in St. Clair County, where Deputy King was arrested—because, in Plaintiff's telling, he wanted to avoid a conflict of interest posed by detaining the Sheriff's brother in St. Clair County. (ECF No. 36-2, PageID.1438-39.) Plaintiff also wanted to avoid embarrassing Deputy King in front of the deputy's friends and coworkers who worked in the jail. (*Id.* at PageID.1439.)

Sheriff King learned about his brother's arrest from Deputy Damon Duva, the president of the deputies' union, at about 3:00 a.m. (ECF No. 36-6, PageID.1791-92; ECF No. 36-7, PageID.2021.) Sheriff King was upset with Plaintiff's handling of the arrest because, in his view, his brother was treated differently than other deputies would have been in similar circumstances. (ECF No. 36-6, PageID.1682, 1795.)[1] Upon learning that Plaintiff had sent his brother to the Lapeer County Jail, Sheriff King called Plaintiff and asked why he had not been notified of the arrest; Plaintiff responded that he felt the Sheriff

---

[1] An individual who is arrested for drunk driving in St. Clair County is ordinarily held in jail until their BAC has lowered to .03. (ECF No. 36-3, PageID.1565-66.) Defendants claim that an exception exists for law-enforcement officials, who are placed in a separate area under the supervision of a deputy until they sober up. (ECF No. 32, PageID.356-57; ECF No. 36-14, PageID.2350.) The apparent rationale of this practice is that it would be unsafe to comingle law-enforcement personnel with the general population of jail inmates. (ECF No. 32-8, PageID.844.) Plaintiff claims to have been unaware of this practice at the time of Deputy King's arrest and disputes that this was ever an official written "policy" of the Sheriff's office. (ECF No. 32-3, PageID.670-71.)

4

had a "conflict of interest." (ECF No. 36-2, PageID.1330.) The Sheriff told Plaintiff to "unfuck this" and ordered Plaintiff to notify the Lapeer County Sheriff's office that Deputy Duva was going to pick up the Sheriff's brother from custody. (ECF No. 36-6, PageID.1794.) Deputy Duva retrieved Deputy King and brought him back to the St. Clair County detective bureau, where they arrived at about 4 a.m., and where Deputy King remained until 9 a.m., until he was released. (ECF No. 36-7, PageID.2045-47, 2050.)

On November 8, 2022, and the days afterward, a Facebook user named Kevin Lindke made several posts providing details about the arrest. (*See* ECF No. 32-10.) The posts were generally critical in tone toward Sheriff King and claimed to receive the information from an anonymous source with knowledge of the arrest. (*See id.*) The posts contained screenshots of messages between Lindke and his anonymous source, who the parties now agree was former St. Clair County Sheriff's Deputy Joshua Goodrich. (ECF No. 32, PageID.360; ECF No. 36, PageID.1154.) The parties dispute where Goodrich got the information that he passed on to Lindke, but Goodrich himself submitted a sworn declaration stating that he received the information from Deputy Chad Cronkright. (ECF No. 36-18.)

On November 10, 2022, Plaintiff requested a meeting with the County's HR department. (ECF No. 36-2, PageID.1372.) Plaintiff met with HR director Diane Barbour on November 14, 2022, and expressed his concerns that Sheriff King had improperly used his authority to obtain special treatment for his brother, Deputy King, following the drunk-driving arrest. (*Id.* at PageID.1372-78.) According to contemporaneous notes taken by Barbour, Plaintiff also stated during this meeting that Deputy King was "still drunk when released." (ECF No. 36-12, PageID.2165.) Plaintiff later testified that he went to HR

because it was not "inside the blue wall" of the Sheriff's department, where he perceived that his concerns would be "buried and controlled and the narrative can be handled." (ECF No. 36-2, PageID.1378.) Barbour told Plaintiff she would "make a few phone calls." (*Id.* at PageID.1376.) Barbour called Plaintiff a few days later and advised him that HR lacked authority to review Sheriff King's actions. (*Id.* at PageID.1378.)

On November 14, after Plaintiff's meeting with HR, Captain Pohl reached out to Plaintiff requesting a meeting to discuss the "traffic stop." (ECF No. 36-2, PageID.1381; ECF No. 32-13, PageID.1100.) Plaintiff agreed to meet with Captain Pohl and Undersheriff Spadafore in Barbour's office in the HR department with Barbour present. (ECF No. 36-2, PageID.1384.) At the meeting on November 17, Plaintiff stated that he had made a formal complaint against Sheriff King for the handling of Deputy King's arrest. (*Id.* at 1391.)[2] Captain Pohl then expressed concerns that Plaintiff had required two of his subordinate deputies to arrest their coworker, rather than conducting the arrest himself. (*Id.* at PageID.1385, 1392.) Captain Pohl's notes indicate that Plaintiff was questioned about the social media postings regarding Deputy King, but Plaintiff does not recall this issue being discussed. (*Id.* at PageID.1392-94; ECF No. 32-13, PageID.1101.)

On November 23, Sheriff King instructed Captain Pohl to investigate violations of the Sheriff's standard of conduct or loyalty policies in connection with the drunk-driving arrest and the social media leaks. (ECF No. 32-13, PageID.1101; ECF No. 36-14, PageID.2336-37.) According to a report prepared by Captain Pohl, he suspected that the information in the social media leaks came from a source within the department because

---

[2] The parties dispute whether Sheriff King or any of his subordinates were aware of Plaintiff's complaint to HR before the meeting.

6

they contained certain details known only to law-enforcement personnel, including (1) Deputy King's BAC at the time of the arrest; (2) that Sheriff King ordered his brother's release from the Lapeer County jail; (3) that Deputy King was scheduled to work with a new trainee in the morning after the arrest; (4) that Sheriff King's fiancée had a bachelorette party on the night of the arrest; and (5) that Deputy King worked overtime on the Monday after the arrest. (ECF No. 32-13, PageID.1099.) Captain Pohl sent emails to six employees, including Plaintiff, requesting an interview to discuss the social media leaks. (ECF No. 32-14.)

On November 30, after interviewing seven other individuals, Captain Pohl interviewed Plaintiff. (ECF No. 32-13, PageID.1104-05.) Steven Sellers, a representative of Plaintiff's union, was present for the interview. (ECF No. 36-2, PageID.1396-97.) Captain Pohl asked if Plaintiff had told anyone outside the department about the arrest, and Plaintiff stated that he had only told his parents. (*Id.* at PageID.1409.) When asked if he knew who might be responsible for the leak, Plaintiff identified Deputy Chad Cronkright. (*Id.* at PageID.1234.) Captain Pohl's last question was whether Plaintiff ever spoke to Goodrich about the arrest, and Plaintiff said that he did not. (*Id.* at PageID.1410.)

Captain Pohl then interviewed Deputy Cronkright, who claimed that Plaintiff was the leaker. (ECF No. 36-14, PageID.2379.) The next day, in a written statement, Deputy Cronkright acknowledged that he informed Goodrich about the arrest after learning about it from Deputy King, but he denied being the leaker. (ECF No. 32-16, PageID.1125.) According to the statement, Goodrich told Deputy Cronkright that Goodrich "got his information from [Plaintiff] as he is friends with [Plaintiff] and he does talk to him." (*Id.*) Deputy Cronkright also provided text messages between him and Goodrich, one of which

indicated that Goodrich was "on the [phone emoji] with [Plaintiff]" on November 9, 2022, when the social media leaks were ongoing. (ECF No. 32-17, PageID.1127.) The statement and text messages suggested that Plaintiff had not given a complete answer when he denied speaking to Goodrich about the arrest during his November 30 interview. (*See* ECF No. 36-2, PageID.1410.)

On the morning of December 9, 2022, Sheriff King, Undersheriff Spadafore, Captain Pohl, and several others met with Deputy Cronkright for an "intervention meeting" to discuss Deputy Cronkright's statement and various recent disciplinary issues involving Deputy Cronkright. (ECF No. 36-17.) It was during this meeting that Deputy Cronkright produced copies of the text messages indicating that Plaintiff was speaking with Goodrich on November 9. (*Id*. at PageID.2543-44.) The meeting concluded with Sheriff King expressing a desire for Deputy Cronkright to "get on the right track." (*Id.* at PageID.2547.) Deputy Cronkright was not disciplined for speaking with Goodrich about the arrest. (*Id.*)

After the meeting, Captain Pohl called Sellers and told Sellers that he had additional information establishing that Plaintiff was the leaker. (ECF No. 36-14, PageID.2433; ECF No. 36-19, PageID.2571-72.) Captain Pohl and Sellers began discussing the idea of Plaintiff retiring. (ECF No. 36-19, PageID.2572-73.) Captain Pohl and Sellers negotiated a proposal whereby Plaintiff would go on paid administrative leave until a date in late January 2023, when he would formally retire. (*Id.* at PageID.2575-78.) Sellers testified that Plaintiff was permitted to choose the date of retirement. (*Id.* at PageID.2578.)

Sellers told Captain Pohl that Sellers would discuss the retirement proposal with Plaintiff over the weekend and provide a response by Monday, December 12. (ECF No.

36-14, PageID.2436.) Sellers' understanding of the proposal was that if Plaintiff took the offer, the investigation would end; if he did not, the investigation would continue. (*Id.* at PageID.2435.) In Plaintiff's recollection, Sellers told him that he had "until Monday [December 12] at 9 a.m. to [either] retire or face discipline." (ECF No. 36-2, PageID.1416.) Sellers was "evasive" about whether the potential discipline would include termination, according to Plaintiff. (*Id.* at PageID.1418-19.) Sellers recalls providing a slightly more nuanced explanation of the potential disciplinary consequences; he recalls telling Plaintiff that Plaintiff would be reinterviewed and that there would be disciplinary consequences if the Sheriff concluded that Plaintiff was the leaker. (ECF No. 36-19, PageID.2578-79.) Plaintiff and Sellers agree that they also discussed the possibility of contesting a disciplinary decision through a grievance and arbitration process. (*Id.*; ECF No. 36-2, PageID.1419.) After speaking with Sellers for a few minutes, Plaintiff decided to accept the proposal. (*Id.* at PageID.1419.)

On December 14, 2022, Plaintiff and Sellers met with the Sheriff, Captain Pohl, and Undersheriff Spadafore. (*Id.* at PageID.1422.) Plaintiff handed over a resignation letter, which he had prepared over the weekend. (*Id.* at PageID.1423.) Plaintiff, the Sheriff, and two witnesses signed a one-page agreement confirming the terms of Plaintiff's retirement. (*See* ECF No. 36-24.) The full text of the agreement is reproduced below:

Internal #: 22-11
December 14, 2022

St. Clair County Sheriff Mat King has agreed to place Lt. Scott Jones on administrative leave with pay from December 14th[,] 2022 through January 21st[,] 2023 from employment with the St. Clair County Sheriff's Office.

Lt. Scott Jones will receive his payouts and holiday pay (if applicable) as defined in the current COAM labor argument [sic] upon

retirement/resignation on January 21st[,] 2023. He will not be eligible for call in overtime during this period

This document is mutually agreed upon by Sheriff Mat King and Scott Jones

[Signatures]

(*Id.*)

At some point after Plaintiff executed the retirement agreement, Captain Pohl completed a report containing "findings" that Plaintiff had violated the Sheriff's "Truthfulness Policy," "Loyalty Policy," and "Standard of Conduct Policy." (ECF No. 36-14, PageID.2233-34.) The report was prepared on Captain Pohl's computer and placed in an "internal folder" with other documents relevant to the investigation. (*Id.* at 2234-35.) There is no suggestion in any party's brief that these findings were shared with any person outside of the department before discovery occurred in this case.

On January 30, 2023, after Plaintiff retired, Sheriff King executed a Michigan Commission on Law Enforcement Standards ("MCOLES") affidavit stating that Plaintiff "[r]etired while under investigation." (ECF No. 36-22.)[3] This was contrary to Sellers' understanding that the department was "going to treat [Plaintiff's] MCOLES as a straight retirement." (ECF No. 36-19, PageID.2620.) According to Sellers, the MCOLES report is shared with other departments, and officers may face difficulties in obtaining employment in a law-enforcement agency if an MCOLES report indicates that they retired under investigation. (*Id.* at PageID.2617-18.)

---

[3] Defendants represent that Sheriff King was required to prepare and submit this document to MCOLES pursuant to Mich. Comp. Laws § 28.561 et seq. and Mich. Admin. Code R. 28.14509. (ECF No. 38, PageID.2699.)

Plaintiff filed this lawsuit in July 2024. Plaintiff alleges that Defendants violated his First and Fourteenth Amendment rights by, *inter alia*, constructively discharging him and retaliating against him for his exercise of protected speech. Following discovery, Defendants moved for summary judgment. (ECF No. 32.) Plaintiff responded (ECF No. 36), and Defendants replied (ECF No. 38).

## II.    Summary Judgment Standard

Summary judgment under Federal Rule of Civil Procedure 56(a) is proper when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When reviewing the record, "the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *United States S.E.C. v. Sierra Brokerage Servs., Inc.*, 712 F.3d 321, 327 (6th Cir. 2013) (quoting *Tysinger v. Police Dep't of Zanesville*, 463 F.3d 569, 572 (6th Cir. 2006)). "'[S]ubstantive law will identify which facts are material,' and 'summary judgment will not lie if the dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The moving party bears the initial burden "of establishing the 'absence of evidence to support the nonmoving party's case.'" *Spurlock v. Whitley*, 79 F. App'x 837, 839 (6th Cir. 2003) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). "Once the moving party has met its burden, the nonmoving party 'must present affirmative evidence on critical issues sufficient to allow a jury to return a verdict in its favor.'" *Id.* (quoting *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 403 (6th Cir. 1992)).

## III.    Analysis

## A. Constructive Discharge

Plaintiff's First and Fourteenth Amendment claims are both based, at least in part, on allegations that Plaintiff was constructively discharged. (*See* ECF No. 17, PageID.196, 199.) The first basis on which Defendants move for summary judgment is that "Plaintiff cannot prove that he was constructively discharged" because he cannot overcome the presumption that his resignation was voluntary. (ECF No. 32, PageID.353, 371.) In response, Plaintiff contends that Defendants created an intolerable working environment by subjecting him to a "sham" investigation, thus forcing him to retire. (ECF No. 36, PageID.1169.)

 "A constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Laster v. City of Kalamazoo*, 746 F.3d 714, 727 (6th Cir. 2014) (quoting *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1188 (2d Cir. 1987)). "In general," however, "employee resignations are presumed to be voluntary." *Rhoads v. Bd. of Educ.*, 103 F. App'x 888, 895 (6th Cir. 2004). An employee may rebut this presumption and prove constructive discharge by showing that "an objectively reasonable person would, under the totality of the circumstances, feel compelled to resign if he were in the employee's position." *Id.* (citation omitted). "Relevant to this inquiry are '(1) whether the employee was given an alternative to resignation, (2) whether the employee understood the nature of the choice [he] was given, (3) whether the employee was given a reasonable time in which to choose, and (4) whether the employee could select the effective date of resignation.'" *Id.* (quoting *Lenz v. Dewey,* 64 F.3d 547, 552 (10th Cir. 1995)). "The mere fact that an employee is forced to choose between resignation and

termination does not alone establish that a subsequent choice to resign is involuntary, provided that the employer had good cause to believe there were grounds for termination." *Id.*

The Sixth Circuit's analysis in *Rhoads* offers a useful illustration of these standards. There, the plaintiff voluntarily resigned from her position as a school bus driver after failing a random drug test. *Id.* at 889. The school district "presented [the plaintiff] with a choice between termination—which was required under the district's policy because she had tested positive for marijuana—and resignation." *Id.* at 895. The plaintiff was given approximately seven hours to make this decision, and she "clearly understood" the "ramifications" of her decision to retire. *Id.* "[S]he was not pressured to make her decision immediately or otherwise coerced into making an uninformed judgment." *Id.* Thus, "[i]n light of the presumption that resignations are voluntary," the Sixth Circuit found that "a jury could not conclude on the basis of the evidence presented that a reasonable person would, if in Rhoads's position, feel compelled to resign." *Id.*

Here, likewise, the evidence in the record fails to overcome the presumption of voluntary resignation. Application of the four factors in *Rhoads* demonstrates that Plaintiff's retirement was voluntary. First, Plaintiff had an alternative to resigning, as he could have chosen to remain employed by the County and contested the investigation. The fact that he feared or expected disciplinary consequences if he remained employed does not establish that he was constructively discharged. *See Rhoads*, 103 F. App'x at 895 ("The mere fact that an employee is forced to choose between resignation and termination does not alone establish that a subsequent choice to resign is involuntary…."). Second, Plaintiff understood that he had a choice between facing

discipline (or, at minimum, continued investigation) or retiring voluntarily, and the terms of his retirement were set forth in a document signed by Plaintiff, the Sheriff, and two witnesses. (*See* ECF No. 36-24.)[4]  Third, Plaintiff was given at least three days to choose between retirement and continued employment (ECF No. 36-14, PageID.2436), which is longer than the approximately seven hours that the Sixth Circuit deemed reasonable in *Rhoads*. And fourth, Plaintiff was allowed to choose the effective date of his resignation. (ECF No. 36-19, PageID.2578.) Thus, just like in *Rhoads*, a reasonable jury could not find that Plaintiff's resignation was effectively involuntary.

As both parties acknowledge, however, there is an exception to the presumption of voluntary resignation where the employer threatens disciplinary action without good cause to believe that grounds for discipline exist. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir. 1995); *Rhoads*, 103 F. App'x at 895. Defendants argue that they had good cause to believe that Plaintiff was the leaker, and therefore subject to discipline or continued investigation, because (1) Plaintiff had access to all of the leaked information, (2) Deputy Cronkright had implicated Plaintiff in the leaks, and (3) Plaintiff was dishonest in his interview with Pohl when he denied speaking with Goodrich. (ECF No. 32, PageID.373.) Plaintiff responds that good cause did not exist because Plaintiff

---

[4] While, as discussed above, Plaintiff's and Sellers' recollections differ slightly as to what the alternative to resignation would be—another interview followed by potential discipline (in Sellers' telling) or discipline (in Plaintiff's telling)—the slight disagreement is not significant enough for the Court to conclude that Plaintiff did not understand the ramifications of his decision such that his decision to retire was involuntary. The nature of the putative discipline was not yet known (although Plaintiff suspected it would be termination) and both Sellers and Plaintiff recall discussing review of any disciplinary action by an arbitrator. Thus, Plaintiff was aware that he faced, at minimum, a possibility of discipline that he would have the opportunity to contest.

was only one of several people with access to all of the leaked information and Deputy Cronkright "had clear motivation to try to clear his name." (ECF No. 36, PageID.1170.)

The parties do not provide a definition of "good cause" in this context. But in *Hargray*, a case cited by both parties for the "good cause" standard, the Eleventh Circuit found that good cause existed when there was "no evidence to suggest" that the plaintiff's former employer "knew or believed the charges of [misconduct] could not be substantiated." 57 F.3d at 1569. Here, likewise, there is no evidence that Sheriff King or his subordinates knew or believed that grounds for further investigation or discipline did not exist. Indeed, they had grounds to believe, at minimum, that Plaintiff had been dishonest when he denied speaking to Goodrich (*see* ECF No. 36-2, PageID.1410) after Deputy Cronkright submitted a statement stating that Plaintiff had spoken to Goodrich and implicated Plaintiff in the leaks (ECF No. 32-16, PageID.1125). While, for reasons discussed below, there is circumstantial evidence that the investigation may have been at least partially motivated by a desire to punish Plaintiff for his complaint to HR, there was also a sufficient basis for Sheriff King and his subordinates to believe that discipline or further investigation was warranted at the time that Plaintiff chose to retire. Accordingly, the no-good-cause exception does not apply in this case.

For the foregoing reasons, a reasonable jury could not conclude that Plaintiff's resignation was involuntary. *See Rhodes*, 103 F. App'x at 895. Summary judgment is therefore GRANTED as to Plaintiff's First and Fourteenth Amendment claims to the extent that they are based on Plaintiff's alleged constructive discharge.

## B. First Amendment Retaliation

Defendants next move for summary judgment on the basis that Plaintiff cannot prevail on his First Amendment retaliation claim. (ECF No. 32, PageID.374.) "First Amendment retaliation claims are analyzed under a burden-shifting framework." *Dye v. Off. of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012). "A plaintiff must first make a prima facie case of retaliation, which comprises the following elements: '(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.'" *Id.* (quoting *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 255 (6th Cir. 2006)). The burden then shifts to Defendants to show "by a preponderance of the evidence that the employment decision would have been the same absent the protected conduct." *Id.* (quoting *Eckerman v. Tenn. Dep't of Safety,* 636 F.3d 202, 208 (6th Cir. 2010)). "Once this shift has occurred, summary judgment is warranted if, in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Id.* at 294-95 (quoting *Eckerman*, 636 F.3d at 208).

### 1.   Protected Speech

The First Amendment protects an individual speaking as a public citizen regarding a matter of public concern. *Lane v. Franks*, 573 U.S. 228, 235-36 (2014). Speech is protected where (1) the speech relates to a "matter of public concern," (2) the speech is not made pursuant to the employee's official duties, and (3) "the employee's interest in speaking, on balance, outweigh[s] the government's interest in promoting an efficient workplace and providing public services." *Ashford v. Univ. of Michigan*, 89 F.4th 960, 971

(6th Cir. 2024). The speech at issue here—Plaintiff's complaint to HR—satisfies all three elements of this test.

*First*, the speech at issue involved a "matter of public concern." *Id*. "[S]tatements reporting instances of maladministration, to authorities both within and outside of an employee's chain of command, constitute speech on a matter of public concern." *Id*. (quoting *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019)) (cleaned up). "[H]ow police departments operate is an 'obvious[]' public concern." *Id*. (quoting *Solomon v. Royal Oak Township*, 842 F.2d 862, 865 (6th Cir. 1988)). Plaintiff's complaint to HR about alleged maladministration within a law-enforcement agency—specifically, the alleged preferential treatment of Sheriff King's brother after the drunk-driving arrest—relates to a matter of public concern under Sixth Circuit precedent.

*Second*, Plaintiff's report to HR was not made "pursuant to [his] ordinary official duties." *Id*. "Whether speech falls within a public employee's official duties does not turn solely on whether the speech contained information they obtained as a result of their employment… but depends primarily on whether the speech is ordinarily within the scope of an employee's duties." *Id*. at 972 (internal citations and quotation marks omitted). "Speech made outside an individual's chain of command is less likely to be within an employee's ordinary job responsibilities, as is speech that an employee's ordinary job responsibilities would not require them to make." *Id*. (collecting cases). For instance, in *Buddenberg*, the Sixth Circuit held that a county employee's report to the county board of health regarding apparent sex-based pay disparities and possible ethics violations by one of her superiors (as alleged in her complaint) was not made pursuant to her official job duties because (1) her "ordinary duties did not include reporting employee misconduct to

the Board," and (2) she "went outside the chain of command by bringing her complaints to the Board." *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019). So too here. Neither party asserts that Plaintiff's ordinary job duties included reporting perceived misconduct to HR. And HR was not within Plaintiff's chain of command; indeed, Plaintiff testified that he went to HR precisely because it was "outside [his] department," and he was later informed that HR had no authority over the Sheriff. (ECF No. 36-2, PageID.1378.)

*Third*, Plaintiff's interest in exposing what he perceived to be favoritism or nepotism within the Sheriff's office "outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Ashford*, 89 F.4th at 971 (quoting *Buddenberg*, 939 F.3d at 739). This is sometimes called "*Pickering* balancing." *Id.* at 973; *see Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968). "[A]s the Supreme Court has explained, in cases involving allegations of official misconduct and public corruption, 'the employer's side of the *Pickering* scale is entirely empty.'" *Buddenberg*, 939 F.3d at 740 (quoting *Lane*, 573 U.S. at 242). This remains true in the law-enforcement context, as "public safety employers [do not] have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests." *Ashford*, 89 F.4th at 973 (quoting *Mosholder v. Barnhardt*, 679 F.3d 443, 451 (6th Cir. 2012)). Since Plaintiff alleged "official misconduct" by the Sheriff in the form of obtaining special treatment for his brother, Plaintiff's interest in speaking outweighs Defendants' interest in efficiently providing public services. *See Buddenberg*, 939 F.3d at 740. Accordingly, Plaintiff's HR complaint was protected speech under the First Amendment.

18

## 2.      Adverse Action

The second prong of Plaintiff's prima facie requires him to show that he was subjected to an adverse action that was "*capable* of deterring a person of ordinary firmness from continuing to engage in the conduct." *Richards v. Perttu*, 96 F.4th 911, 918 (6th Cir. 2024) (quoting *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010)) (emphasis in original). The plaintiff need not show that the speech was actually deterred to satisfy this requirement. *Id.* "[T]his element is not an overly difficult one for the plaintiff to meet." *Id.* (quoting *Hill*, 630 F.3d at 472). "[U]nless the claimed retaliatory action is truly inconsequential, the plaintiff's claim should go to the jury." *Id.* (quoting *Bell v. Johnson*, 308 F.3d 594, 603 (6th Cir. 2002)).

Plaintiff claims that he suffered three "adverse employment actions" sufficient to support a retaliation claim: (1) "making him the target of a sham investigation that was predetermined to end with finding Plaintiff as the leaker"; (2) making formal disciplinary findings against Plaintiff; and (3) "constructively discharg[ing]" Plaintiff when he was "forced to retire." (ECF No. 36, PageID.1167.) For reasons already discussed, the Court does not find that Plaintiff was constructively discharged. *See* Part III.A, *supra*. The Court will therefore address the alleged "sham" investigation and the disciplinary findings.

### a.  "Sham" Investigation

Plaintiff contends that Defendants subjected him to an adverse employment action when they conducted an "investigation designed to find his [] guilt, despite doing nothing wrong." (ECF No. 36, PageID.1168-69.) Plaintiff points to *Pasley v. Conerly*, 345 F. App'x 981 (6th Cir. 2009), and *Scott v. Churchill*, 377 F.3d 565 (6th Cir. 2004), for the proposition that "the mere potential threat of disciplinary sanctions is sufficiently adverse action to

19

support a claim of retaliation." *Pasley*, 345 F. App'x at 985 (quoting *Scott*, 377 F.3d at 571-72). In *Pasley*, the Sixth Circuit held that a prison official's threat to move a prisoner "out of his unit so that he would lose his job" and "use her influence with a warden to have him moved to a location where his family would not be able to visit him" gave rise to a First Amendment retaliation claim. *Id.* And in *Scott*, a prison guard retaliated against an inmate after the inmate threatened to report the guard by filing a false major-misconduct charge against the inmate; if successful, the charge could have resulted in "higher security classification, placement in administrative segregation, or forfeiture of good-time credits." *Scott*, 377 F.3d at 567.

Defendants respond that Plaintiff's argument about the threat of disciplinary action is irrelevant because "it is undisputed that no such threat was ever made." (ECF No. 38, PageID.2698.) While Defendants are apparently correct that Sheriff King and his subordinates never directly threatened Plaintiff with termination or other discipline, the "threat" at issue was not a verbal threat. Plaintiff contends that Sheriff King retaliated against him by launching an investigation that was "designed to find his guilt" and could result in discipline. (ECF No. 36, PageID.1169.) In the same way, the adverse action taken in *Scott* was not just that the plaintiff was verbally threatened, but that the plaintiff was wrongfully subjected to charges that, if successful, would have resulted in disciplinary consequences. *See Scott*, 377 F.3d at 567. Because a pretextual investigation would similarly result in disciplinary consequences (including, possibly, termination), the Court agrees that such a pretextual investigation could dissuade a person of ordinary firmness from speaking out against an employer.

The Court also finds it significant that Plaintiff's prospects for future employment may have been affected by the investigation. Actions that threaten the plaintiff's livelihood or economic interests may constitute adverse action. *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 728 (6th Cir. 2010); *Harris v. Bornhorst*, 513 F.3d 503, 519 (6th Cir. 2008). Sheriff King executed an MCOLES separation affidavit indicating that Plaintiff "[r]etired under investigation." (ECF No. 36-22, PageID.2652.) Sellers testified that this could have a negative impact on Plaintiff's ability to obtain work in law enforcement in the future, if he chose to pursue such opportunities. (ECF No. 36-19, PageID.2594.)[5] Defendants do not dispute this testimony but merely insist that the affidavit "had to be completed that way" because Plaintiff was in fact "under investigation when he retired." (ECF No. 38, PageID.2699.) Of course, as Sheriff King acknowledged in his deposition, the investigation was initiated at his direction, and he could have terminated the investigation if he chose to do so. (ECF No. 32-2, PageID.474-77, 562.) Assuming it is true that the Sheriff had no choice but to state that Plaintiff retired under investigation, the fact that he had to do this only establishes that his choice to carry out the investigation had foreseeable negative consequences for Plaintiff's career prospects.

The allegedly retaliatory investigation created a threat of disciplinary consequences and may impair Plaintiff's ability to find work in law enforcement in the future. Such consequences are significant enough that they are capable of deterring a person of ordinary firmness from exercising First Amendment rights. The investigation

---

[5] While Sellers recalls that Plaintiff did not have any interest in working at another-law enforcement agency (*id.*), Plaintiff maintains that he would like to find another job in law enforcement commensurate with his old position (ECF No. 36-2, PageID.1209-10).

therefore qualifies as an adverse action if it was motivated by a desire to retaliate against Plaintiff for his exercise of First Amendment protected speech.

### b.  Formal Disciplinary Findings

Plaintiff claims that Defendants made "findings against him" that are "permanently on Plaintiff's record going forward." (ECF No. 36, PageID.1169.) These "findings" are apparently limited to Captain Pohl's internal investigation report, which found that Plaintiff violated the Department's truthfulness, loyalty, and standard of conduct policies. (ECF No. 32-13, PageID.1107.) After completing the report, Captain Pohl placed a copy in a physical file folder. (ECF No. 32-8, PageID.825-26.) Plaintiff points to no evidence establishing that these findings were shared with a third party or would be shared in the future (other than in discovery in this lawsuit). To the extent that the "formal disciplinary findings" are separate from the investigation itself as an act of retaliation, there is no indication that the findings harmed Plaintiff's reputation or otherwise caused Plaintiff any material injury. They are therefore non-actionable as a matter of law. *See Wurzelbacher v. Jones-Kelley*, 675 F.3d 580, 584 (6th Cir. 2012) (citations omitted) (affirming dismissal of retaliation claim where plaintiff "did not suffer a threat to his economic livelihood," "was not defamed," "did not endure a search or seizure of property," and "did not experience the public disclosure of intimate or embarrassing information"). So, while the alleged "sham" investigation may constitute an adverse action for First Amendment purposes, the mere fact that disciplinary "findings" were made against Plaintiff does not.

### 3.  Causation

The third prong of Plaintiff's prima facie case requires him to show that "there is a causal connection between elements one and two—that is, the adverse action was

motivated at least in part by his protected conduct." *Ashford*, 89 F.4th at 974 (quoting *Dye*, 702 F.3d at 294). If Plaintiff establishes that the retaliatory action was caused, at least in part, by his protected speech, Defendants have the burden of showing, by a preponderance of the evidence, that they would have taken the same alleged retaliatory action absent the protected conduct. *Ashford*, 89 F.4th at 974. But "[u]nlike in the *McDonnell Douglas* burden-shifting framework, the burden does not shift back to a plaintiff to show pretext in First Amendment retaliation claims." *Dye*, 702 F.3d at 295.

Defendants argue that Plaintiff cannot prove causation because "Plaintiff cannot establish that the investigation would not have taken place had he not gone to human resources." (ECF No. 32, PageID.375.) In response, Plaintiff identifies two pieces of circumstantial evidence supporting causation. First, Plaintiff points to the temporal proximity (or lack thereof) between the leaks and the investigation: Plaintiff observes that "Defendants waited more than two weeks after Lindke's initial posts on November 9 to launch an investigation into the social media leak, doing so only after Plaintiff's complaint [to HR]." (ECF No. 36, PageID.1171.) Second, Plaintiff argues that Deputy Cronkright was not subjected to the same degree of scrutiny as Plaintiff, despite Deputy Cronkright's admission that he provided at least some information about the arrest to Goodrich. (*Id.* at PageID.1172.)

Plaintiff has carried his burden to show a prima facie case of causation. "Temporal proximity between the protected activity and the adverse action can support a causal connection." *Buddenberg*, 939 F.3d at 741; *see also Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 499 (6th Cir. 2017) (quoting *Hamilton v. Gen. Elec. Co.*, 556 F.3d 428, 435 (6th Cir. 2009) ("[W]here an adverse employment action occurs very close in time after

an employer learns of protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation.") The fact that Sheriff King directed Captain Pohl to begin an investigation on November 23, 2022—about two weeks after the leaks began, but less than a week after Plaintiff informed Captain Pohl and Undersheriff Spadafore about the HR complaint on November 17—supports an inference that Sheriff King launched the investigation in response to Plaintiff's complaint. The fact that Deputy Cronkright received no discipline whatsoever, despite admitting to providing information to Goodrich, also somewhat undermines the notion that the Sheriff and his subordinates were solely motivated by a desire to find or punish the leaker. There is sufficient evidence to suggest that the investigation was motivated, at least in part, by a desire to punish Plaintiff for his complaint to HR.

Defendants respond that "the Sheriff had ample reason to investigate to determine who was the source of the social media leaks independent of Plaintiff, and conducting such an investigation is a legitimate, non-retaliatory/non-discriminatory reason." (ECF No. 32, PageID.375-76.) It is certainly possible that the investigation was solely motivated by the Sheriff's desire to find the source of the leak. Yet, as discussed, there is also circumstantial evidence suggesting that the investigation was motivated by the Sheriff's desire to punish Plaintiff's report to HR. Both theories are plausible, but neither can be proven conclusively at this stage.

"[I]n the First Amendment context, '[a] defendant's motivation for taking action against the plaintiff is usually a matter best suited for the jury.'" *Dye*, 702 F.3d at 308 (quoting *Paige v. Coyner*, 614 F.3d 273, 282 (6th Cir.2010)). This case is no exception.

There is a genuine issue of material fact as to the motivations underlying the Sheriff's actions, such that a reasonable factfinder could conclude that "the adverse action was motivated at least in part by [Plaintiff's] protected conduct." *Ashford*, 89 F.4th at 974 (quoting *Dye*, 702 F.3d at 294). Summary judgment on the issue of causation is therefore improper.

### 4. *Elrod/Branti*

Defendants also claim that Plaintiff's First Amendment claim fails under the *Elrod/Branti* exception. This doctrine provides that "public employees in 'policymaking or confidential positions' may be terminated for politically-motivated reasons without violating the First Amendment." *Simasko v. Cnty. of St. Clair,* 417 F.3d 559, 562 (6th Cir. 2005); *see Elrod v. Burns*, 427 U.S. 347, 367-68 (1976) (plurality opinion); *Branti v. Finkel*, 445 U.S. 507, 517 (1980). "The *Elrod/Branti* exception applies not only to discharges based on political affiliation, but also to terminations based on actual speech." *Simasko*, 417 F.3d at 562 (citation omitted). In determining whether *Elrod/Branti* applies, the Court must examine the "inherent duties of the position, rather than the actual tasks undertaken by the employee." *Latham v. Off. of Atty. Gen. of State of Ohio*, 395 F.3d 261, 267 (6th Cir. 2005) (citation omitted). "While the 'inherent duties of the position' are not necessarily those that appear in the written job description and authorizing statute, such descriptions can be instructive." *Id.* (citation omitted). "[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether... party affiliation is an appropriate requirement for the effective performance of the public office involved." *Cagle v. Headley*, 148 F. App'x 442, 445 (6th Cir. 2005) (quoting *Branti*, 445 U.S. at 518).

The Sixth Circuit has outlined four categories of employees who may be discharged for their political speech or beliefs under *Elrod/Branti*:

> **Category One:** positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> **Category Two:** positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;
>
> **Category Three:** confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;
>
> **Category Four:** positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

*McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996) (footnotes omitted). On the other hand, "positions that exercise 'no discretion of political significance' are generally entitled to First Amendment protection." *Back v. Hall*, 537 F.3d 552, 556 (6th Cir. 2008) (quoting *id.* at 1559).

Defendants argue that Plaintiff is a category three official within the *McCloud* framework because:

> Plaintiff was one of four lieutenants who supervised an entire platoon of 12 officers on behalf of the Sheriff and thus "control the lines of communications" to those officers, he was expected to "carry out the directives and the missions of the sheriff," he acted on behalf of the sheriff and represented the sheriff in his absence, he appeared and spoke on behalf of the sheriff at township board meetings, represented the sheriff at community events, fire chief meetings, and on the honor guard.

(ECF No. 32, PageID.378-79.)

26

These activities do not make Plaintiff a category three official. The defining characteristic of such officials is that they "advise[]" or "control the lines of communications to" persons within category one or category two, who are typically high-level executive decisionmakers or persons with similar authority. *See McCloud*, 97 F.3d at 1557, 1557 n.30. But Defendants do not suggest that Plaintiff routinely advised Sheriff King, a category one official, or Undersheriff Spadafore and Captain Pohl, who might qualify as category two officials, on how they should exercise their authority. Nor do Defendants suggest that Plaintiff "control[ed] the lines of communication *to*" these individuals. *Id.* at 1557 (emphasis added). Rather, Plaintiff apparently "control[led] the lines of communication" *from* those individuals *to* his inferiors. (*See* ECF No. 32, PageID.378.) But merely having supervisory responsibilities does not take a government employee outside of First Amendment protection. Indeed, one of the plaintiffs in *Elrod* was a chief deputy sheriff who oversaw multiple departments, and the Supreme Court held that this supervisory officer could not be terminated for political reasons. *Elrod*, 427 U.S. at 350-51; *see also McCloud*, 97 F.3d at 1554 (observing that a "chief deputy sheriff of process division who supervises all departments of a sheriff's office working on one floor of the building housing the office," like one of the plaintiffs in *Elrod*, "clearly fall[s] outside of the *Branti* exception"). Thus, the fact that Plaintiff occupied a supervisory role in a law-enforcement agency does not make him subject to termination or other adverse action for political reasons under *Elrod/Branti*. Absent further evidence that Plaintiff advised the

Sheriff or exercised some "discretion of political significance" on the Sheriff's behalf, the Court cannot conclude that *Elrod/Branti* applies. *See Back*, 537 F.3d at 556.[6]

*Cagle*, discussed by Plaintiff and Defendants, offers a useful contrast to this case. There, the Sixth Circuit found that the lieutenants of the Williamson County, Tennessee sheriff's department were category-three policymakers for the purpose of *Elrod/Branti* where they were "the Sheriff's primary advisers, implementers of policy and managers of numerous deputy sheriffs." *Cagle*, 148 F. App'x at 446-47. "The lieutenants also advised the sheriff on policy and personnel matters, including employment decisions involving promotion, demotion, termination and hiring." *Id.* at 447. Further, the lieutenants "had authority to assume command of the department in the absence of the sheriff" and the plaintiff had exercised this authority in the past. *Id.* "The lieutenants, in short, were collectively the sheriff's second in command…." *Id.*

Plaintiff's position is different from that of the lieutenants in *Cagle* in several material respects. First, as noted, the record does not indicate that Plaintiff was one of Sheriff King's "primary advisers." *Cagle*, 148 F. App'x at 446. Second, the lieutenants in *Cagle* were directly subordinate to the sheriff in the chain of command or separated by only one layer of command, *see id.* at 447, whereas Plaintiff was separated from Sheriff King by at least two layers of command. Third, there is no indication that Plaintiff exercised "command of the department in the absence of the sheriff." *Id.* Plaintiff's job description contemplates that he will "[a]ssume command at investigations or emergency situations

---

[6] As noted, Defendants also point to evidence that Plaintiff "represented" or "spoke on behalf" of the Sheriff at township board meetings and community events, such as parades, 4H fairs and the honor guard. Defendants do not supply any caselaw or reasoning to explain how these responsibilities made Plaintiff an employee for whom termination or other politically motivated adverse actions would be appropriate.

in the absence of the Undersheriff or Sheriff" (ECF No. 36-23, PageID.2655) but does not suggest that Plaintiff would ever have occasion to take command of the entire 250-person department.

Plaintiff may share the same title as the lieutenants in *Cagle*, but he did not advise the Sheriff on policy matters or exercise the Sheriff's discretionary authority in a politically relevant way. Thus, the Court cannot conclude that Plaintiff occupied a confidential or policymaking position subject to politically motivated discipline or retaliation under *Elrod/Branti*.

*Elrod/Branti* is also inapplicable because Plaintiff's complaint to HR cannot be construed as a disagreement about politics or policy. The doctrine is typically applied in cases of politically motivated "patronage dismissals." *See, e.g.*, *Elrod*, 427 U.S. at 358; *Branti*, 445 U.S. at 514; *see also Simasko*, 417 F.3d at 562 (emphasis added) ("[P]ublic employees in 'policymaking or confidential positions' may be terminated for *politically-motivated reasons* without violating the First Amendment."). While Defendants contend that "Plaintiff's alleged complaint to Human Resources is obviously a difference in the Sheriff's policy views" (ECF No. 38, PageID.2694), Defendants do not identify any specific policy disagreement between Plaintiff and Sherrif King. Indeed, Plaintiff claims that he was subjected to investigation in retaliation for his complaint to HR about a conflict of interest, not for his disagreement with any policy views held by the Sheriff. Plaintiff alleges retaliation for what essentially amounts to an ethics complaint, and "[s]uch complaints cannot be brushed off as mere political or policy disagreements." *Kardasz v. Spranger,* No. 17-cv-10937, 2019 WL 1989021, at *4 (E.D. Mich. May 6, 2019) (declining to apply

*Elrod/Branti* exception where plaintiffs were discharged after complaining to county ethics board).

In sum, there is a question of fact as to whether the Sheriff's investigation was motivated, at least in part, by a desire to retaliate against Plaintiff for speech protected under the First Amendment. Defendants' *Elrod/Branti* defense fails because Plaintiff did not occupy a confidential or policymaking position, and the alleged retaliation was not based on political or policy disagreements. For the foregoing reasons, summary judgment on Plaintiff's First Amendment claim is GRANTED to the extent that the claim is predicated on a constructive discharge or the disciplinary findings that were not published to third parties but is otherwise DENIED.

### C.  Due Process

The Due Process Clause of the Fourteenth Amendment to the U.S. Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950)). "To establish a procedural due process claim pursuant to § 1983, plaintiffs must establish three elements: (1) that they have a life, liberty, or property interest protected by the Due Process Clause of the Fourteenth Amendment to the United States Constitution, (2) that they were deprived of this protected interest within the meaning of the Due Process Clause, and (3) that the state did not afford them adequate procedural rights prior to depriving them of their protected interest." *Hahn v. Star Bank*,

190 F.3d 708, 716 (6th Cir. 1999) (citing *Zinermon v. Burch*, 494 U.S. 113, 125-26 (1990)). Plaintiff claims that he was unconstitutionally deprived of two constitutionally protected interests without sufficient process.

First, Plaintiff contends that he was deprived of his property interest in continued employment when he was constructively discharged. (ECF No. 17, PageID.198-99.) For the reasons discussed above, Plaintiff cannot overcome the presumption that his resignation was voluntary. Thus, Plaintiff's resignation does not result in a constructive discharge or a due process violation. *See Rhoads*, 103 F. App'x at 894 ("[I]f a plaintiff resigns of her own free will, even as a result of the defendant's actions, then she voluntarily relinquishes her property interest in continued employment, and the defendant cannot be found to have deprived her of that interest without due process of law.").

Second, Plaintiff contends that Defendants deprived him of his liberty interest in his "good name, reputation, honor, and integrity" when they made disciplinary findings against him after his resignation without giving him a chance to dispute them. (ECF No. 36, PageID.1175.) It is true that "[a] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment." *Quinn v. Shirey*, 293 F.3d 315, 319 (6th Cir. 2002) (quoting *Chilingirian v. Boris,* 882 F.2d 200, 205 (6th Cir.1989)). The Sixth Circuit has held that a public employee is entitled to a "name-clearing hearing" to challenge a former employer's defamatory or stigmatizing statements where the following five requirements are satisfied:

> First, the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment.... Second, a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance.... Third, the stigmatizing statements or charges must be made public. Fourth,

31

the plaintiff must claim that the charges made against him were false. Lastly, the public dissemination must have been voluntary.

*Id.* at 320 (quoting *Brown v. City of Niota,* 214 F.3d 718, 722–23 (6th Cir.2000)). "Once a plaintiff has established the existence of all five elements, he is entitled to a name-clearing hearing if he requests one." *Id.* (quoting *Brown,* 214 F.3d at 723.)

Plaintiff cannot satisfy the third requirement because there is no evidence that the "stigmatizing statements"—the investigative findings against Plaintiff—were ever "made public." *Id.* (quoting *Brown,* 214 F.3d at 723); *see also Loudermill*, 470 U.S. at 547 n.13 (affirming dismissal of due process claims related to an "accusation of dishonesty" because plaintiff did not "allege that the reasons for the dismissal were published"). As discussed, it appears that the investigative findings were placed in a folder and never disseminated to any third parties until they were produced in discovery in this case. Because there is no evidence that any third party was aware of the disparaging investigatory findings, Plaintiff cannot sustain a due process claim.[7]

Plaintiff cannot show that he was deprived of a property interest or a liberty interest without due process of law. Accordingly, Defendant's motion for summary judgment is GRANTED as to the due process claims.

---

[7] Plaintiff's claim that he was deprived of a liberty interest in his reputation also fails because there is no indication that Plaintiff ever requested a name-clearing hearing to dispute the adverse disciplinary findings. *See Quinn*, 293 F.3d at 324 ("[A] plaintiff who fails to allege that he has requested a hearing and was denied the same has no cause of action, whether or not he had been informed of a right to a hearing before filing suit."). The Court cannot exactly fault Plaintiff for failing to request a hearing, since he would have no reason to know about the disparaging findings until they were produced in discovery. But, on the other hand, the fact that Plaintiff was never aware of the findings until this lawsuit only underscores the point, made above, that Plaintiff's reputation could not have been damaged by disciplinary findings that were apparently never disclosed to anyone outside the Sheriff's office before this case.

### D. Qualified Immunity

Defendants also assert that the claims against Sheriff King must be dismissed under qualified immunity. The Court must consider "(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right was clearly established" at the time of the violation. *Ashford*, 89 F.4th at 970 (quoting *Bazzi v. City of Dearborn*, 658 F.3d 598, 606-07 (6th Cir. 2011)). "A right is clearly established if there is binding precedent from the Supreme Court, the Sixth Circuit, the district court itself, or other circuits that is directly on point." *Gaspers v. Ohio Dep't of Youth Servs.*, 648 F.3d 400, 417 (6th Cir. 2011) (quoting *Risbridger v. Connelly,* 275 F.3d 565, 569 (6th Cir. 2002)). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent." *Id.* (quoting *Wilson v. Layne,* 526 U.S. 603, 615 (1999)). "Public officials could 'still be on notice that their conduct violates established law even in novel factual circumstances.'" *Id.* (quoting *Hope v. Pelzer,* 536 U.S. 730, 741 (2002)).

On the first prong, the Court has already determined that there is a question of fact as to whether Plaintiff's First Amendment rights were violated when Sheriff King and his subordinates allegedly retaliated against Plaintiff through their investigation and potential discipline of him. On the second prong, Plaintiff's exercise of First Amendment rights under the circumstances described in this case are clearly established. "[T]here is no doubt that there is a clearly established constitutional right to speak, even as a government employee, on a matter of public concern regarding issues outside of one's day-to-day job responsibilities, absent a showing that *Pickering* balancing favors the

government's particular interest in promoting efficiency or public safety." *Ashford*, 89 F.4th at 975 (citing *Buddenberg*, 939 F.3d at 739-40). It was also clearly established at the time of the alleged constitutional violations that Plaintiff had a right to report perceived misconduct within his workplace without retaliation. *See Buddenberg*, 939 F.3d at 741 ("Buddenberg's right to report public corruption, unethical conduct, and sex-based discrimination within her workplace was clearly established.").

Nor is Sheriff King entitled to qualified immunity under the *Elrod/Branti* defense. It is clearly established that public employees who "exercise 'no discretion of political significance' are generally entitled to First Amendment protection." *Back*, 537 F.3d at 556 (quoting *McCloud*, 97 F.3d at 1559). As discussed, Plaintiff was not fired for his political or policy views, so *Elrod/Branti* does not apply in this context. But even if it did, it is clearly established that employees are not subject to dismissal under *Elrod/Branti* merely because they occupy managerial or supervisory roles. *See McCloud*, 97 F.3d at 1558 (affirming denial of qualified immunity to group of "governmental middle managers" absent further evidence of politically relevant discretion). The Sixth Circuit has expressly stated that a "chief deputy sheriff of process division who supervises all departments of a sheriff's office working on one floor of the building housing the office"—a position with supervisory responsibilities similar to Plaintiff's—would "clearly fall outside the *Branti* exception." *Id.* at 1554.[8] Summary judgment on the basis of qualified immunity is therefore DENIED.

---

[8] In the *Elrod/Branti* context, a decision prohibiting the termination of an employee in a similar position, not the same position, suffices to preclude qualified immunity. *See Back*, 537 F.3d at 557 (quoting *McCloud*, 97 F.3d at 1556) ("We have previously rejected 'the notion that there must be a separate patronage dismissal decision ... involving a particular position before qualified immunity can be denied.'").

### E.  Accord and Satisfaction

Defendants also seek summary judgment under the doctrine of accord and satisfaction. Accord and satisfaction is an affirmative defense on which Defendants bear the burden of proof. *See Faith Reformed Church of Traverse City, Michigan v. Thompson*, 639 N.W.2d 831, 833 (Mich. Ct. App. 2001). "An 'accord' is an agreement between parties to give and accept, in settlement of a claim or previous agreement, something other than that which is claimed to be due, and 'satisfaction' is the performance or execution of the new agreement." *Id*. "To prove the existence of an accord and satisfaction, a defendant must show (1) its good-faith dispute of (2) an unliquidated claim of the plaintiff, (3) its conditional tender of money in satisfaction of the claim, and (4) the plaintiff's acceptance of the tender (5) while fully informed of the condition." *Id.* at 833-34. The expression of the condition must be "so clear, full and explicit that it is not susceptible of any other interpretation." *Nationwide Mut. Ins. Co. v. Quality Builders, Inc.*, 482 N.W.2d 474, 478 (Mich. Ct. App. 1992) (quoting *Durkin v. Everhot Heater Co.*, 254 N.W. 187, 189 (Mich. 1934)).

Defendants argue that Plaintiff agreed to settle or release his claims against Defendants by way of accord and satisfaction when he accepted the Sheriff's voluntary retirement proposal and entered into the December 14, 2022, agreement. (ECF No. 32, PageID.380.) This argument fails because Defendants fail to show that Plaintiff was "fully informed" of his purported release of claims against Defendants, the purported "condition" of his voluntary retirement. *See Faith Reformed Church*, 639 N.W.2d at 834. The December 14 agreement itself says nothing about a release of claims or waiver of rights

to sue Defendants. (*See* ECF No. 36-24.) And there is no evidence extrinsic to the agreement clearly demonstrating that Plaintiff understood himself to be releasing Defendants from any future claims. The most Defendants offer is Sellers's testimony characterizing the voluntary retirement deal as a "settlement agreement type thing." (ECF No. 36-19, PageID.2581.) The surrounding testimony, however, contains no reference to a contemplated lawsuit by Plaintiff against Defendants or the possibility that Plaintiff was waiving the right to bring such a lawsuit. Sellers' use of the term "settlement" could just as easily refer to a settlement of the investigation or the disciplinary proceedings. To the extent that this statement can be construed as suggesting that the parties understood Plaintiff's voluntary retirement to be a waiver of a right to sue, it is hardly "so clear, full and explicit that it is not susceptible of any other interpretation." *Nationwide Mut. Ins. Co.*, 482 N.W.2d at 478 (quoting *Durkin*, 254 N.W. at 189). Defendants bear the burden of proof on this defense, and they have not met it. The Court therefore DENIES summary judgment on the accord and satisfaction theory.

### F.  *Monell* Liability

Finally, Defendants seek summary judgment in favor of the County because it cannot be liable under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Defendants argue that *Monell* liability cannot attach because "Plaintiff cannot point to any County policy or custom that caused the alleged deprivation of his rights." (ECF No. 32, PageID.381.) Plaintiff responds that the County is responsible for the Sheriff's actions because the Sheriff is an official whose "edicts or acts may fairly be said to represent official policy." (ECF No. 36, PageID.1178 (quoting *Monell*, 436 U.S. at 694)).

Under *Monell* and subsequent cases, an "official policy" often, but not always, refers to "fixed plans of action to be followed under similar circumstances consistently and over time." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480-81 (1986). But when a governmental body's "authorized decisionmakers" adopt a particular course of action, "it surely represents an act of official government 'policy' as that term is commonly understood." *Id.* at 481. Thus, municipal liability attaches when a constitutional violation is attributable to an official who "possesses final authority to establish municipal policy with respect to the action ordered." *Id.*

Here, Sheriff King's actions can be imputed to the County under *Monell*. Sheriff King testified that he had exclusive disciplinary authority within his department. (ECF No. 36-6, PageID.1725.) There is no indication that the Sheriff's actions are subject to the review of anyone else within the County. His actions therefore constitute the policy of the County with respect to disciplinary actions within his own department—including his department's allegedly retaliatory investigation of Plaintiff. Since the alleged act of First Amendment retaliation was an investigation carried out at the direction of an official whose actions represent the official policy of the County, the Court DENIES summary judgment on *Monell* liability.

## IV.    Conclusion

Summary judgment is GRANTED as to Plaintiff's due process claim. Summary judgment is GRANTED as to Plaintiff's First Amendment theory to the extent that it relies on Plaintiff's alleged constructive discharge or the disciplinary findings that were not shared with third parties before this lawsuit. Summary judgment is otherwise DENIED as to Plaintiff's First Amendment claim and is DENIED in all other respects.

SO ORDERED.

s/ Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated: December 29, 2025

I hereby certify that a copy of the foregoing document was served upon counsel

of record on December 29, 2025, by electronic and/or ordinary mail.

s/ Marlena Williams
Case Manager